UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

REGINALD D. "DON" WHITTINGTON, JR., )
                                     )
           Plaintiff,           )
                                       )
      vs.                       )       1:06-cv-0333-JDT-TAB
                                       )
INDIANAPOLIS MOTOR SPEEDWAY    )
FOUNDATION, INC. a/k/a HALL OF FAME )
MUSEUM,                               )
                                       )
           Defendant.         )

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 26)
AND PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT (Doc. No. 34)[1]**

      This lawsuit is about a very fast, and valuable, race car.

      In 1979, a driver racing team consisting of the Plaintiff, Reginald D. "Don"

Whittington, Jr., his brother Bill Whittington, and a talented German driver, Klaus

Ludwig, won the 24 Hours of Le Mans in a Porsche 935.[2]  The French car race is the

Indianapolis 500 of endurance racing, attracting nearly as much attention and

spectators, and so the Whittington's 935 K-3 (so labeled to reflect the modifications of

Kremer Racing) is a rather famous car.

---

     [1]  This Entry is a matter of public record and will be made available on the court's web site.  However, the discussion herein is not sufficiently novel to justify commercial publication.

     [2]  The race, officially the 24 Heures du Mans, is held annually near the town of Le Mans, on a circuit combining race track and closed public roads.

It is also worth considerable money.  Don Whittington believes the Porsche could fetch $2,000,000 as a collectible.  (Pl's Resp. No. 24.)  The Defendant, who is the Indianapolis Motor Speedway Foundation, Inc. ("Foundation"), insured the car for $375,000 in 1997, so it is probably worth at least that much.

This litigation arises over its ownership.  In the early 1980s, the Porsche was delivered to the Foundation, which operates the Indianapolis Motor Speedway Hall of Fame Museum ("Museum").  Whittington says he loaned the car; the Foundation says he donated it.  Regardless, for more than twenty years, the Foundation maintained and insured the car, and sometimes displayed it.

Whittington continued to race for several years. He then dissolved the brothers' racing company and subsequently went to prison for 18 months after being convicted on a tax conspiracy charge.[3]  About sixteen years later, in July or August of 2004, he called

---

[3]  Whittington objects to the admissibility of his conviction and the underlying details as being irrelevant, of limited probative value, and not permitted by Federal Rule of Evidence 609 because more than ten years have elapsed since Whittington's release from prison.  (Pl.'s Br. 6.)  Rule 609 generally bars the admission of such convictions "[f]or the purpose of attacking the character for truthfulness of a witness."  Fed. R. Evid. 609.  Evidence of a criminal conviction is admissible for other purposes.  *See* Fed. R. Evid. 404(b).  Here, the court will consider Whittington's testimony about his conviction and incarceration as it is relevant to the ownership of the race car, and therefore, to the statute of limitations and laches defenses raised by the Foundation.  To this extent, the evidence would meet the Seventh Circuit's four-part test for admissibility under 404(b).  *See Mathis v. Phillips Chevrolet, Inc.*, 269 F.3d 771, 775-76 (7th Cir. 2001); *Harris v. Davis*, 874 F.2d 461, 464 (7th Cir. 1989).  It pertains to an issue other than Whittington's propensity to commit a crime.  It is close enough in time because it occurred during the time period at issue, and it is sufficiently similar given the limited details and purpose for which it is being considered.  Whittington's own testimony is sufficient to satisfy a jury that he was convicted on a tax count.  Lastly, the conviction is relevant given that the potential forfeiture of assets in a criminal proceeding might be probative of Whittington's ownership.  Although not discussed in these briefs, it might be interesting to know whether Whittington reported the ownership of this vehicle in the affidavit he was required to file with the probation office in connection with the pre-sentence report related to this conviction, pursuant to 18 U.S.C. §

(continued...)

the Foundation and asked that the Porsche be returned to him so that he could show it at a vintage car event in Daytona, Florida.

Museum Director Ellen Bireley replied by letter on October 12, 2004.  (Compl. Ex. A.)  She said the Foundation's records indicated the Porsche had been donated. Whittington's attorney responded March 8, 2005, with a written demand for documentation of a donation or, failing that, the return of the car.  Whittington subsequently filed this lawsuit on February 27, 2006.  The Complaint alleges claims of conversion and replevin, and seeks the return of the car, damages, costs, attorney fees, and other relief.

The Foundation filed a Motion for Summary Judgment (Doc. No. 26) on April 23, 2007.  It asserts Whittington waited too long and that his claims are barred by the statute of limitations and the equitable doctrine of laches.  Whittington responded on May 30, 2007, with a Brief in Support of [Plaintiff's] Motion for Summary Judgment and In Opposition to Defendant's Motion For Summary Judgment (Doc. No. 34), which will be treated as a cross-motion for summary judgment.[4]

The amount in controversy exceeds $75,000, exclusive of costs and interest, and the parties are citizens of different states.[5]  This matter is therefore properly before

---

[3](...continued)
3664(d)(3).

[4]  Whittington did not file a separate motion for summary judgment.

[5]  Although the Complaint alleges that the parties are citizens of different states, it asserts with respect to Whittington that he is a resident of Florida.  This allegation of residency
(continued...)

the court pursuant to 28 U.S.C. §1332(a)(1).  The motions are briefed and ready for review.  The court rules as follows.

## I.  BACKGROUND

The history of the Porsche 935 K-3 is little more than a story of handshake deals. After acquiring the race car for the 1979 Le Mans race, Whittington and his brother raced the car some more, but apparently without similar success.   (Whittington Dep. 58, 65.)  The car crashed at one point and by the early 1980s was gathering dust in Fort Lauderdale, Florida.  (*Id.* at 63-65.)  "The rules changed and the car was obsolete."  (*Id.* at 65.)

According to Whittington, the idea of loaning the car to the Museum was first broached about May 1980.  (*Id.* at 63.)  He was talking with Charlie Thompson, who was the Indianapolis Motor Speedway superintendent, a position of no small importance.[6]  Thompson kept his office in the Museum, which is located on the Speedway grounds.  (Jack Martin Dep. 12, Feb. 23, 2006.)  In Whittington's estimation,

---

[5](...continued)
in Florida is insufficient to show that he is a citizen of Florida.  *See Nilssen v. Motorola, Inc.*, 255 F.3d 410, 412 (7th Cir. 2001) (stating "[i]t is citizenship that counts for purposes of jurisdiction").
    Although supporting exhibits strongly indicate that Whittington is indeed a citizen of Florida, the court **ORDERS** Whittington to allege within twenty days, either by affidavit or amended complaint, his citizenship.

[6]    Former Museum Director Jack Martin testified in his deposition that he believed Mr. Thompson became superintendent in the mid-1980s, replacing former Superintendent Clarence Cagle upon his retirement.  (Martin Dep. 12, Feb. 23, 2006.)  Defendants also assert that Thompson "was solely the head grounds keeper of the Indianapolis Motor Speedway."  (Def.'s Br. 4 n.4.)  Without commenting further, the court notes that Thompson and Cagle, in their capacity as superintendents of the Speedway, were prominent in motor racing circles, and their subsequent deaths in 1995 and 2003, respectively, were well noted.

Thompson was the "everyday guy in charge of things" at the Speedway. (Whittington Dep. 62.) "He had the keys to the gate, the garage, and probably the vault, too." (*Id.* at 63.)

Thompson expressed some interest in having the car at the Museum, even though it was a road-racing car, and Whittington said he liked the idea, also. (*Id.* at 64-65.) In the fall of 1980, after the Porsche's crash and retirement from racing, Whittington said he talked with Thompson and "struck up a deal." (*Id.* at 65-66.) However, the Porsche had been modified since winning the Le Mans race. (*Id.* at 67.) Whittington said it took months to restore the car. (*Id.*) "We wanted to put it back like it was when it raced at Le Mans. . . . So we gathered up the older stuff, put it back on the car." (*Id.*) When the car was ready, Whittington loaded it onto a truck and had two of his employees drive it to the Museum. (*Id.* at 68.)

Jack Martin, who was then director of the Museum, recalls the decision to send the car to Indianapolis differently. Martin said Bill Whittington approached Clarence Cagle (whom Martin believed to be Speedway's superintendent at the time) and indicated Whittington's desire "to make a gift of the car." (Martin Dep. 7-8, Jan. 9, 2006.) Cagle referred Bill Whittington to Martin. (*Id.* at 8.) "[Whittington] asked if we would be interested in having the car. I told him as a gift to the Speedway, we would." (Martin Dep. 15, Feb. 23, 2006.)

In a deposition taken January 9, 2006, Martin said Don and Bill Whittington presented the car to the Museum during the practice time preceding an Indianapolis

500.  (Martin Dep. 9-10, Jan. 9, 2006)  The Whittingtons had brought two Indy cars to race.  (*Id.* at 10.)  The presentation was made in the garage area by the track.  "[A]s I recall it, there was a car – one of the Indy cars was to the south, and the other one was to the north, and the Le Mans car was in between."  (*Id.*)

In subsequent testimony, Martin did not recall any such presentation.  He said that after his conversation with Whittington, his next contact with anyone regarding the Porsche was when the car was delivered.  (Martin Dep. 15-16, Feb. 23, 2006.)  "And whether it was the Whittingtons that did that or their carrier, I don't know which."  (*Id.* at 16.)  Martin recalled some pictures taken of the Whittington brothers and their two Indy cars during a 500 practice between 1982 and 1985.  (*Id.* at 17.)  "I don't recall whether the Porsche was there or not at that time."  (*Id.*)

Regardless of whose account is more accurate,  records of the transfer have not been found.  (Martin Dep. 11, Jan. 9, 2006; Bireley Dep. 40.)  Martin testified that gifts were often made "with just a handshake" while details of loans were "most certainly" documented, particularly regarding details such as the duration.  (*Id.* at 11-12.)  The number of loaned cars were few, although more than Martin remembered.  (*Compare* Martin Dep. 8, Feb. 23, 2006, *with* Def.'s Ex. C-3.)  Moreover, Martin said the Museum had little reason to accept the Porsche as anything but a gift.  "It wasn't the type of car that you would want to take on a loan; there's just very little relationship between Le Mans and the Speedway."  (*Id.* at 20.)

Nor are there indirect records establishing whether the Porsche was a donation or a loan.  The Museum insures all of its cars, those that it owns and those on loan, under the same insurance policy.  (Martin Dep. 24, Jan. 9, 2006)   The exhibit placard identifying the car did not state its ownership.  (Pl.'s Ex. C (Bireley Dep. Ex. 20).) Whittington has asserted, without challenge, that the Foundation did not report the Porsche as a contribution on its non-profit Form 990 tax records.[7]  (Pl.'s Br. 10, 16.)

Ellen Bireley, the Museum's current director, complied a list of Museum owned cars, on which the Porsche appears, by checking the car files.  (Bireley Dep. 24.)  She said the files on owned cars and loaned cars were kept in separate file drawers but concedes that mistakes were made.  (*Id.* at 24, 50-51.)

A Museum information card sheet lists the Porsche as a donated vehicle but a notation card suggests the card was created well after the transfer.  Under "Historical Data," the card states, "Between 1980 and 1985 the vehicle was donated to IMS Foundation, Inc., by Bill and Don Whittington."  (Pl.'s Ex. I.)  The card bears no other indication of when it was produced.

In August 2001, the Foundation applied for, and obtained, an Indiana certificate of title.  (Def.'s Ex. C-5 2-4.)  The application does not list a prior title number, and the only apparent documentation submitted with the application was a police officer's

---

[7]  The parties have stipulated that the 990s "for the years in question" list donations of $25.00, $5.00, $100.00, and $0.00.  (Pl.'s Br. 10.)

inspection affidavit. (*Id.*) The application lists March 5, 2001, as the date of purchase. (*Id.* at 4.)

Whittington asserts that from 1979, shortly after buying the Porsche, until the mid-1980s, one of the brothers' companies held title to the Porsche. (Whittington Dep. 59.) In dividing their business interests prior to incarceration, Don Whittington took possession of the Porsche in Indianapolis. (*Id.* at 118-20.) He says he disclosed the Porsche, or its value, to the government in connection with his incarceration. (*Id.* at 109-11, 122.) He has been unable to locate the disclosure list. (*Id.* at 112.) (Nor for that matter, was the Foundation able to do so. (See Pl.'s Ex. C (Bireley Dep. Ex. 16).) However, Whittington is confident some documentation remains about the division of assets. (*Id.* at 118.)

Whittington had few contacts with the Museum or related officials after the car was sent to Indianapolis. He met with Thompson once in the early 1980s, and while there visited the Porsche, which was then in the Museum's basement. (Whittington Dep. 76-77.) He remembered the car being "spotlessly clean" and doesn't recall any discussion about the car's ownership. (*Id.* at 77.)

Whittington said that he would have spoken to Thompson the few times he came to race at the Speedway afterward, and that they would have mentioned the car in those conversations. (*Id.* at 78-79.) He recalled speaking with Thompson in the late 1980s. (*Id.* at 79-80.)

He did not speak with any Foundation or Speedway officials again until he called the Museum in 2004, asking that the car be released to him for an event involving vintage cars in Daytona, Florida.  (Whittington Dep. 81-82; Bireley Dep 35.)  Whittington said he called initially for Thompson, only to learn that Thompson had died some time earlier.  (Whittington Dep. 104.)

According to Bireley, Whittington first called in January and left a message, requesting the car.  (Bireley Dep. 35.)  She attempted to return the call twice, both times leaving only her telephone number and a message that she had called.[8]  (*Id.* at 35-36.)

When they did finally speak in late July or early August, Bireley said she and Whittington disagreed about who owned the car.  (*Id.* at 32.)  Whittington recalls asserting his claim of ownership but states in his deposition that Bireley was evasive and did not clearly indicate the Foundation's claim until her letter of October 12, 2004. (Whittington Dep. 82.)  He says in his affidavit, however, that a Foundation representative told him of its claim in July or August 2004.  (Whittington Aff. ¶ 10.)

Whittington demanded the return of the Porsche (or proof of the Foundation's ownership) in a letter dated March 8, 2005, from his attorney Bruce D. Green to Bireley. (Compl. Ex. B.)  The Foundation reasserted its claim of ownership (barring proof of

---

[8]  The Foundation has included a "Memo to file" dated February 2004 that contains various statements indicating that Whittington had contacted Martin by then and suggesting that the Foundation was by then concerned about the ownership of the Porsche.  (Def.'s Ex. C-5 5.) These statements would appear to be hearsay.  Although Whittington has not objected to their admission, the court will not consider them further at this stage for two reasons.  First, neither Whittington, Martin, nor Bireley testify to such a contact.  Secondly, the Foundation has not referred to the memorandum in its briefs.

Whittington's claim) in a letter dated March 23, 2005, from Mark J. Richards, an attorney representing the Foundation, to Green.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  An issue of fact is material if it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When deciding a motion for summary judgment, the court must consider all evidence, and draw all reasonable inferences therefrom, in the light most favorable to the nonmoving party.  *See id.* at 255.  The moving party "bears the initial responsibility" of identifying specific facts within the record that "demonstrate the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  When a motion for summary judgment is made and properly supported, the non-moving party may not rest on the pleadings or denials but must set forth the specific evidence showing there is a genuine issue of material fact that requires a trial.  Fed. R. Civ. P. 56(e).  A mere scintilla of evidence will not do.  *Anderson*, 477 U.S. at 252.  At the summary judgment stage, the judge's function is "to determine where there is a genuine issue for trial."  *Id.* at 249.

## III.  DISCUSSION

As the record makes clear, the circumstances surrounding the transfer of the Porsche 935 K-3 are vigorously disputed.  Not only do the parties dispute whether the car was donated or loaned, they disagree about who made the offer to whom.  Neither Whittington nor the Foundation can point to written records – either those made contemporaneously or later – that establish the nature and circumstances of the transfer, or its ownership.  (In Indiana, a "certificate of title is not of itself proof of ownership or legal title" to a car.  *Royal Indem. Ins. Co. v. Shue*, 182 N.E.2d 796, 799 (Ind. Ct. App. 1962).)  For this reason, the court **DENIES** Whittington's cross-motion for summary judgment.  The only remaining issues are the Foundation's claims that the statute of limitations and equitable doctrine of laches preclude this dispute from being litigated.

Nearly a quarter of a century has passed.  Some memories have dimmed.  Others have been extinguished.  Yet the passage of time in itself is not necessarily conclusive or even remarkable, particularly in cases involving museums.  *See* Linden Havemeyer Wise, *Old Loans: A Collections Management Problem*, C479 A.L.I.-A.B.A. 41, 43-36 (1990) (noting the development of statutory schemes to address museum issues resulting from old loans and undocumented property).  Long-term loans, sometimes called "permanent" loans, are not uncommon among museums.  *Id.*; *see also Lackawanna Chapter of the Ry. & Locomotive Historical Soc.*, --- F.3d ---, ---, 2007 WL 2301927, at *3 (8th Cir. Aug. 14, 2007) (noting, in a dispute over a steam locomotive on loan for more than fifty years, that "without more, possession and control

11

[did not] entitle the museum to a presumption of ownership or continued possession that overcomes a lender's good title").

Indiana enacted a statutory scheme in 1989 to provide museums with a means of quieting title to property of questionable ownership.  Ind. Code §§ 32-24-5-1 to -16 (originally codified at §§ 32-9-10-1 to -16).  The General Assembly defined "loan" as a deposit of property not accompanied by a transfer of title, *id.* § 32-34-5-3, "permanent loan" as a loan of property for an indefinite period, *id.* § 32-34-5-5, and "undocumented property" as property in the museum's possession "for which the museum cannot determine the owner by reference to the museum's records" (*id.* § 32-34-5-8).  A museum "*may* acquire title" to permanent loans by giving notice of its intent to terminate the loan and consider the property a donation if not collected, and it will then obtain title if, after one year, the lender has not responded.  *Id.* § 32-34-5-12.  A museum "may acquire title" to undocumented property held by the museum for at least seven years by providing a similar notice but giving the lender three years to assert an interest in the property.  *Id.* § 32-34-5-12.

As the Foundation points out, the law is permissive.  (Def.'s Reply 7 (citing *Lake County Auditor v. Burks*, 802 N.E.2d 896, 899 (Ind. 2004).)  The statutory scheme did not require the Foundation to seek title to the Porsche in this fashion.  However, the enaction of the statutes evinces the General Assembly's recognition that mere passage of time does not entitle a museum to a presumption of ownership.

The statutes are also consistent with the general legal understanding that a long-term loan creates a bailment, in which the museum has a duty to care for the object until the bailment is terminated.  Wise, *Old Loans*, C479 A.L.I.-A.B.A. at 43-44.  Under Indiana law, a bailment is an agreement "that one party (the bailor) will entrust personal property to another (the bailee) for a specific purpose and that, when the purpose is accomplished, the bailee will return the property to the bailor."  *Dado v. Jennings*, 743 N.E.2d 291, 294 (Ind. Ct. App. 2001).  The agreement can be express or implied.  *Id.*

Whether or not a bailment existed is, of course, the underlying issue of this litigation.  If Whittington donated the car, no bailor-bailee relationship was established.  For the purposes of the Foundation's summary judgment motion, however, Whittington has provided sufficient evidence from which a trier of fact could conclude that a bailment existed.  It is in this context that Indiana's statute of limitations and its application of the equitable doctrine of laches is considered.[9]

### A. Statute of Limitations

Whittington's conversion claim is governed by a two-year statute of limitations.  Ind. Code § 34-11-2-4.  His replevin claim, which is an action to recover possession of personal property, is governed by a six-year statute of limitations.  *Id.* § 34-11-2-7.  In general, the clock starts when the cause of action accrues.  Both parties agree, however, that under Indiana's discovery rule, these statutes of limitations do not begin

---

[9]  Both parties have assumed that Indiana law governs, and the court agrees, insofar as the car is here and Indiana appears to have the greatest number of contacts and interest in this litigation.

to run until "the plaintiff knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sustained as a result of the tortious act of another." *Wehling v. Citizens Nat'l Bank*, 586 N.E.2d 840, 843 (Ind. 1992).

The Foundation asserts that Whittington, "in the exercise of reasonable diligence," should long ago have discovered the dispute over ownership.  (Def.'s Br. 9.) "Any inquiry whatsoever would have alerted a reasonable person that the Foundation was claiming ownership of the Porsche K-3."  (*Id.*)  In particular, the Foundation suggests that a reasonable person would have inquired about the car before going to prison, upon being released from prison, and "[a]t very least" upon listing the Porsche as an asset in applying for a loan (as Whittington did in 1997).  (*Id.* at 10).

In short, the Foundation argues that the discovery rule imposes a requirement upon a plaintiff to check, at least periodically, on whether he has been injured. "[Whittington] glosses over the unambiguous imposition of a reasonable person standard to the application of the statute of limitations, requiring plaintiffs to exercise ordinary diligence and make reasonable inquiry to determine whether an 'injury" has been sustained."  (Def.'s Reply 3.)

This is not the discovery rule.  The rule's "due diligence" language does not impose a "reasonable person" standard on a plaintiff's knowledge of injury, at least to the extent of requiring citizens to regularly monitor all their dealings for signs of injury or

wrong-doing.[10]  Such an interpretation would emasculate the discovery rule, and Indiana courts have not applied the rule this way.

Rather, in the cases cited by the Defendant, the courts' concern was whether the plaintiff exercised diligence after receiving some indication of a wrong or injury.  *See, e.g.*, *Cooper Indus., LLC v. City of South Bend*, 863 N.E.2d 1253, 1259 (Ind. Ct. App. 2007) (finding that a city's cause of action in an environmental contamination case began to accrue when the city received a consultant's report identifying several environmental concerns); *Verdak v. Butler Univ.*, 856 N.E.2d 126, 133-34 (Ind. Ct. App. 2006) (stating that a letter seeking the return of the disputed materials "would have alerted a reasonable person that [the university] was claiming an ownership interest"); *Perryman v. Motorist Mut. Ins. Co.*, 846 N.E.2d 683, 690 (Ind. Ct. App. 2006) (holding that plaintiff's claims were barred by the two-year statute of limitations when he "admitted to having discovered and being aware of his injury" ten years earlier).  The issue is whether a plaintiff, at the time in question, possessed "sufficient information to cause him to inquire further in order to determine whether a legal wrong has occurred." *Perryman*, 846 N.E.2d at 689.

In this light, when viewing the facts and inferences in the non-moving party's favor, the Foundation has not conclusively established that any of its actions – or those of others – alerted Whittington to its claim of ownership prior to 2004.  The discovery

---

[10]  Although not relevant here, the Supreme Court's phrasing in *Wehling* suggests that the court was concerned not about due diligence in discovering an injury but due diligence in discovering "that an injury had been sustained *as a result of the tortious act of another.*"  586 N.E.2d at 843 (emphasis added).

rule did not impose a duty on Whittington to check periodically on the status of a permanent loan.  Indeed, the reputation of the International Motor Speedway, with which the Foundation is associated, would likely be sufficient assurance for many that the Museum was fulfilling its bailee obligations to maintain and care for the car.

Under Indiana law, the tort of conversion is, generally, the appropriation of another person's personal property in defiance of the lawful owner's rights.  *Dominiack Mech., Inc. v Dunbar*, 757 N.E.2d 186, 188-89 (Ind. Ct. App. 2001).  The statute of limitations on Whittington's conversion claim began to run when he received sufficient information of the Foundation's claim that no bailment existed.

Replevin is a legal action to obtain the return of property wrongfully withheld (and, in some cases, damages incidental to the wrongful withholding).  *Coleman v. Vukovich*, 825 N.E. 2d 397, 407 (Ind. 2005); *see also State v. Willits*, 773 N.E.2d 808, 813 (Ind. 2002) (noting the historical distinction between conversion and replevin).  If the defendant obtained possession lawfully, the plaintiff usually has no cause of action until he demands, and the defendant refuses, the return of the property (unless demand would be futile).  *Tucker v. Capital City Riggers*, 437 N.E.2d 1048, 1051 (Ind. Ct. App. 1982).  However, as the Foundation notes, the statute of limitations cannot be tolled by delaying the demand.  (Pl.'s Br. 10.)

Traditionally, the demand had to be made within a reasonable time, which was formerly defined as the period set by the statute of limitations.  *Hamrick v. Indianapolis Humane Soc.*, 273 F.2d 7, 9 (7th Cir. 1959) (citing *High v. Bd. of Comm'rs*, 92 Ind. 580,

587 (Ind. 1884)).  Given the Indiana Supreme Court's decision in *Wehling* to extend the discovery rule to all tort actions, this definition provides little guidance, but the general rule remains.  Demand must still be made within a reasonable time.  Thus, the statute of limitations on Whittington's replevin claim began to run when he received sufficient information that a reasonable person would have demanded the return of his property.

In this case, then, the statute of limitations began to run on both of Whittington's claims at least by late July or early August 2004 when, according to Whittington's affidavit, he learned that the Foundation was claiming ownership of the car, or at least, according to Whittington's deposition, Bireley's evasive answers would have led a reasonable person to demand the return of his property.  This does not mean that facts may yet develop showing that the statute of limitations began to run even earlier.  These facts, however, are not yet in the record, and the Foundation's motion for summary judgment based on the statute of limitations must be **DENIED**.

### B. Laches

The Foundation also asserts that Whittington's claims are barred by laches, the long-standing doctrine that a court of equity will not come to the aid of persons who sleep on their rights and show no excuse for their neglect in asserting them.  *Speidel v. Henrici*, 120 U.S. 377, 387 (1887).   To invoke this doctrine in defense, a party in Indiana must show the plaintiff's "(1) inexcusable delay in asserting a known right; (2) an implied waiver arising from knowing acquiescence in existing conditions; and (3) a change in circumstances causing prejudice to the adverse party."  *Ebersol v. Mishler*,

17

775 N.E.2d 373, 378 (Ind. Ct. App. 2002) (citing *Shafer v. Lambie*, 667 N.E.2d 226, 231 (Ind. Ct. App. 1996)); *see also Pickett v. Pickett*, 470 N.E.2d 751, 754 (Ind. Ct. App. 1984).

The Foundation asserts that the more than twenty years that lapsed before Whittington asserted any interest in the Porsche was manifestly unreasonable and amounted to an inexcusable delay and implied waiver per se.  (Def.'s Reply 5.)  "Plaintiff wholly failed to assert any interest whatsoever in the Porsche K-3 from 1982 until 2004 despite knowledge of the Foundation's open and notorious possession and the Foundation's efforts with regards [sic] to storing, maintaining, insuring, and displaying the vehicle."  (Def.'s Br. 11.)  Whittington disputes the delay was inexcusable and that he knew of the Foundation's claim of ownership.  "Once Whittington learned of the injury, he took immediate action to recover the Porsche . . . ."  (Pl.'s Br. 20.)

Neither party addresses the preliminary issue of whether the equitable doctrine of laches can be applied in this case.  Traditionally, the defense of laches was available only in the courts of equity.  *See* 27A Am. Jur. 2d Equity §§ 149-50.  Since the merger of the courts of equity and law, many jurisdictions have allowed the doctrine to be applied to cases at law.  *Maksym v. Loesch*, 937 F.2d 1237, 1248 (7th Cir. 1991).  However, it is far from certain that Indiana is one of those jurisdictions.  In 2004, this court examined Indiana law and concluded that courts of this state did not appear to have expanded the doctrine beyond equity cases.  *See Walters v. PDI Mgmt. Servs.*, 2004 WL 1622217, at *11 (S.D. Ind. April 6, 2004) (citing *Shriner v. Sheehan*, 773 N.E.2d 833, 846 (Ind. Ct. App. 2002)).  The Indiana Supreme Court's most recent

discussion of laches does not dispel this conclusion.  In *SMDfund, Inc., v. Fort Wayne-Allen County Airport Auth.*, 831 N.E.2d 725, 728 (Ind. 2005), the court first determined whether plaintiff's claims were grounded in equity.  Only then did the court conclude, "Because this action is equitable, laches may operate to bar the claim."  *Id.* at 729.

If the doctrine of laches is limited to equitable claims, as this language in *SMDfund* strongly suggests, then the Foundation is probably barred from asserting laches in this case.  Conversion and replevin are tort claims long considered to be actions at law.  *See, e.g.*, *Colglazier v. Colglazier*, 20 N.E. 490, 492 (Ind. 1889) (noting that an "action for unlawful conversion is an action at law"); *Thompson v. Peck*, 18 N.E. 16, 19 (Ind. 1888) (stating that "[r]eplevin is strictly an action at law").

However, even if the Foundation were able to recharacterize Whittington's claims as equitable (and perhaps this would make sense, given that this litigation is very much akin to an equitable action to quiet title), the Foundation's laches defense falls short.

As the Indiana Supreme Court noted in *SMDfund*, "laches does not turn on time alone."  831 N.E. at 731.  A party must show that the delay was inexcusable and amounted to an implied waiver "arising from knowing acquiescence."  *Ebersol*, 775 N.E.2d at 378.  Moreover, the party must show the delay worked a change of circumstances resulting in a prejudice or injury.  *SMDfund*, 831 N.E. at 731.

In this case, the prejudice or injury is apparent.  Key witnesses who could help establish which account of the car's transfer is accurate – the Foundation's or Whittington's – are dead.  Indiana courts recognize that the passage of time may effect

a prejudice or injury by erasing the availability of witnesses or their ability to testify. *See, e.g.*, *In re Siegel*, 708 N.E.2d 869, 871 (Ind. 1999) (noting that "[s]uccessful invocation of the doctrine in civil cases has included proof that available witnesses did not have a distinct recollection of the details of the case or that they had no access to records which would disclose the same").

It is on the first two elements of laches that the Foundation's summary judgment motion falters.  The Foundation has not shown that a passage of twenty or more years was unreasonable if, as Whittington maintains, the car was given to the Museum as a long-term loan.  Nor has the Foundation provided evidence that Whittington was aware of its claim of ownership until 2004.  The mere passage of time did not amount to an implied waiver.  The Foundation's motion for summary judgment based on the equitable doctrine of laches must also be **DENIED**.


## IV.  CONCLUSION

For the reasons stated above, the court **DENIES** the Foundation's Motion for Summary Judgment (Doc. No. 26) and Whittington's Cross-Motion for Summary Judgment (Doc. No. 34).  It appears that this dispute can only be concluded by trial on the merits.

In addition, the court **ORDERS** Whittington to allege within **twenty (20) days**, either by affidavit or amended complaint, his citizenship.

ALL OF WHICH IS ENTERED this 12th day of September 2007.

_____

John Daniel Tinder, Judge
United States District Court

Copies to:

Magistrate Judge Tim A. Baker

James P. Moloy
DANN PECAR NEWMAN & KLEIMAN
jmoloy@dannpecar.com

William L. O'Connor
DANN PECAR NEWMAN & KLEIMAN
woconnor@dannpecar.com

Angela Pease Krahulik
ICE MILLER LLP
krahulik@icemiller.com

David M. Mattingly
ICE MILLER LLP
david.mattingly@icemiller.com